## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **HEATHER SCHLEGEL,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-1288-JAR-KGG** |
| **FINNEY COUNTY, KANSAS, BOARD OF COMMISSIONERS,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Heather Schlegel filed suit against her former employer, Defendant Finney County, Kansas, Board of Commissioners ("the County") asserting claims of sex discrimination, hostile work environment, and retaliatory discharge under Title VII of the Civil Rights Act of 1964.  Before the Court is the County's Motion for Summary Judgment on Plaintiff Heather Schlegel's Claims (Doc. 36).[1]  The motion is fully briefed, and the Court is prepared to rule.  For the reasons set forth in detail below, the Court grants in part and denies in part the County's motion on Plaintiff's sex discrimination claims; denies the County's motion on Plaintiff's hostile work environment claims; and grants the County's motion on Plaintiff's retaliatory discharge claims.

### I.   Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In

---

[1] On December 12, 2022, Plaintiff Shawn Dewey filed a Stipulation of Dismissal, dismissing all of his claims against the County with prejudice.  *See* Doc. 40.

[2] Fed. R. Civ. P. 56(a).

applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the non-moving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  Once the movant has met this initial burden, the burden shifts to the nonmoving party "to set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[11]  The nonmoving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

---

[3] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[8] *Anderson*, 477 U.S. at 256.

[9] *Id.*

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671)).

[11] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

or speculation.[12]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[13]

## II.   Uncontroverted Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

Plaintiff Heather Schlegel is a female who identifies her sexual orientation as a lesbian. The County is an employer within the meaning of Title VII.  On January 25, 2011, Plaintiff began her employment with the County as a detention officer at the Southwest Kansas Regional Juvenile Detention Center ("JDC").

### *Plaintiff's Pre-January 2020 Disciplinary History*

The events giving rise to Plaintiff's lawsuit began in January 2020. Prior to that time, Plaintiff had been disciplined by the County numerous times.

First, on January 19, 2012, Plaintiff was reprimanded for violating a JDC safety rule by placing two juveniles in the same room before one of the juveniles had gone through the intake process.  Second, on or around October 3, 2012, Plaintiff was issued a warning for mocking a juvenile's speech impediment.  Third, on October 17, 2012, Plaintiff was reprimanded for allowing two juveniles to touch a pregnant juvenile's stomach, and for telling the pregnant juvenile "[t]his is probably how you ended up with this problem, sitting around with guys touching your stomach."[14]  Fourth, on September 2, 2014, Plaintiff was reprimanded for showing an unapproved video to the juveniles.  Fifth, on October 10, 2014, Plaintiff was reprimanded for

---

[12] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[13] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[14] Doc. 37-4 at 1.

violating a safety and security rule when she failed to ensure that a juvenile returning from court was properly searched for contraband.  Sixth, on October 24, 2015, Plaintiff was reprimanded for engaging in indecent and insulting language in front of the juvenile residents of the JDC and was warned that "[i]f this type of behavior ever happens again you could be dismissed for the good of the service."[15]  Seventh, on May 10, 2019, Plaintiff was reprimanded for comments made to a new staff member that was "of African descent."[16]

In addition to the specific incidents listed above, Plaintiff was disciplined prior to January 2020 for reasons such as failing to check the medications of juveniles, failing to report to work on time, calling in sick the day before or after scheduled days off, failing to complete the intake checklist on a juvenile, and providing inaccurate information to other employees.

Finally, at the beginning of Plaintiff's career at JDC, the County initiated an investigation into an allegation of inappropriate behavior between Plaintiff and two other employees, including JDC Director Katrina Pollet.

***Plaintiff's Pre-2020 Positive Feedback***

Despite the reprimands discussed above, Plaintiff also received positive feedback from the County prior to 2020.  For example, the County told Plaintiff that she was a good employee and was one of the employees the County could always count on.  Furthermore, in December 2014, the County promoted Plaintiff to acting shift supervisor.  Plaintiff was promoted again in April 2018 from Acting Shift Supervisor to Interim Supervisor, and her pay was increased by $1.00 per hour.

---

[15] Doc. 37-9 at 3.

[16] Doc. 37-10 at 1.

*Plaintiff's January 2020 Discipline*

Plaintiff received several more reprimands from the County in the early part of 2020.  On January 9, 2020, Plaintiff was given a verbal warning for failing to complete assigned tasks the day prior.  Then, on January 30, 2020, Plaintiff received a letter of reprimand for inappropriate remarks she made to a guest speaker during a training session on January 22, 2020.  The January 30, 2020 letter of reprimand was prepared by Pollet, Sharyn Campbell (JDC's Operations Coordinator), and Darlene Lucas (then-County Human Resources Director), but was signed by Campbell.  As laid out in the letter, Plaintiff was subject to the following discipline as a result of the January 22, 2020 incident: five days of unpaid leave (i.e., suspension); demotion from Acting Supervisor to Juvenile Corrections Officer; reduction in pay of $1.82 per hour; requirement to complete three classes assigned by Human Resources; and placement on one year of probation at which time any further disciplinary actions would result in immediate termination.  As part of Plaintiff's probation, she was not eligible for any promotion during that one-year period.  Plaintiff's immediate supervisor, Clifton Carter, was also disciplined for his role in the harassment of the guest trainer on January 22, 2020, including being placed on a one-year corrective action plan.

*Plaintiff's Formal Discrimination Complaint*

On March 4, 2020, Plaintiff filed a complaint with Lucas regarding discriminatory comments Campbell allegedly made during a training session that Plaintiff attended on February 12, 2020 and February 26, 2020.  Plaintiff met with Lucas and her subordinate, Kelly Munyan, on March 5, 2020 to discuss Plaintiff's complaint.  At that meeting, Lucas told Plaintiff that, to help with the stress of the incident, she could begin her previously scheduled FMLA leave a few days early.  Lucas also proposed during the meeting that when Plaintiff returned from FMLA

leave, Plaintiff be temporarily re-assigned to the Emergency Management Department.  While she did not necessarily want to work in the Emergency Management Department, Plaintiff did not want to return to work under Campbell's supervision.

Upon returning to work from FMLA leave on April 22, 2020, Plaintiff began working in the Emergency Management Department, while maintaining the same salary and benefits.  On April 28, 2020, Lucas informed Plaintiff that after investigating Plaintiff's claims against Campbell, she found wrongdoing by Campbell and administered corrective actions as a result. Lucas notified Campbell of the same on May 1, 2020, and informed her that she was required to cease her discriminatory behavior, that this was her final warning, and that if there were further violations, the County would terminate her employment for cause.

### 2020 Personnel Changes

There were several relevant personnel changes over the summer and fall of 2020.  On May 12, 2020, Campbell submitted her two weeks' notice of resignation, which Pollet accepted as effective that same day.  On September 21, 2020, Lucas left the County, at which time Munyan became Acting Director of Human Resources and subsequently the Director of Human Resources.  Pollet retired effective September 30, 2020, at which time Beth Beavers became Interim Director, and ultimately Director.

### Plaintiff's Return to JDC

On September 21, 2020, Plaintiff began working again at the JDC.  Two weeks later, on October 5, 2020, one of Plaintiff's co-workers, Sadie Wilken, reported to the County that Plaintiff had made crude comments of a sexual nature in front of juveniles a few days prior. Wilken's report included the following statement:

> After I clocked in for my shift, D.O. Debra came in from her last check on the floor. When Debora came in[,] [Plaintiff] asked

Debra if the juveniles complained about her giving them a warning for sexual comments.  Debra gave her reply and after that [Plaintiff] went on to talk out loud about what exactly the juveniles were talking about.  She then followed up with "I don't blame complaining about 'dingle berries' cause I don't like them on the people I sleep with" and "There's nothing worse than a person with shit around their asshole . . . you know they bend over and all you see are dingle berries".  She went on to say that she stopped the talk once one of the juveniles said something about "a girl having a mustache around her asshole" and that she only stopped it because it "wasn't believable for a woman to have that or at least I've never seen one with that, I don't know about you gentlemen . . .".  During this time I tried to ignore the talk and not participate in it by reading past shift summaries while D.O. Casey [Schnaithman] and Acting Sup. Shawn [Dewey] laughed and made little comments here and there (I cannot recall exactly what they said).[17]

Also on October 5, 2020, the County received a report from another one of Plaintiff's co-workers, Phyllicia Ibarra, stating that Plaintiff had told a juvenile that Ibarra was a "dyke". Plaintiff denies that she ever made the statement Wilkens refers to about "dingle berries" or called anyone, including Ibarra, a "dyke".

### *Plaintiff's Termination*

On October 27, 2020, Beavers notified Plaintiff that her employment was being terminated effective immediately due to the October 5 reports and after taking into consideration Plaintiff's disciplinary history.  Although Plaintiff was never interviewed about either of the reported incidents, Beavers ultimately concluded that Plaintiff had violated the County's Sexual Harassment policy, which prohibits acts including but not limited to telling sexually-oriented jokes and making sexually-offensive remarks.  Shawn Dewey, Plaintiff's supervisor, and Detention Officer Casey Schnaithman were also disciplined for their participation in the conversation recounted in Wilken's report.  Like Plaintiff, Dewey was terminated effective

---

[17] Doc. 37-21.

immediately for both his involvement in Wilken's complaint as well as in consideration of his disciplinary history.  Schnaithman, on the other hand, was disciplined but was not terminated because the County maintained that his disciplinary history was not similar to Plaintiff's and Dewey's.

***Plaintiff's Claims of Discrimination Over the Years***

Plaintiff faced numerous instances of discrimination during her tenure at JDC. For example, on one instance, Plaintiff heard the word "dyke" used in the control room in reference to her.  Although Plaintiff did not file a formal complaint of discrimination after this incident, she verbally complained to her immediate supervisor, Carter, as well as to Mary Gonzalez (JDC's Assistant Director) and Pollet.  Plaintiff's co-workers referred to lesbians generally as "dykes," and discriminatory comments about lesbians were made on at least a monthly basis.

Additionally, early in her employment at JDC, Plaintiff worked with Rick Schwindt, a supervisor, who told her directly that he did not like gay people.  Again, while Plaintiff did not file a formal complaint of discrimination about the incident, she verbally complained to her supervisors about it.  During this same time, whenever Plaintiff would sign up for an overtime shift, her name would somehow be removed, resulting in her inability to work overtime shifts.

Furthermore, when Plaintiff was transferred back to JDC from the Emergency Management Department, she was forced to work in the pods more frequently than other detention officers.  Plaintiff heard from her co-workers that they were supposed to run Plaintiff off by working her in the pods.

Notwithstanding the above, neither Carter, Gonzalez, Lucas, Pollet, nor Beavers were ever discriminatory towards Plaintiff.

III.   **Discussion**

Plaintiff brings three claims against the County under Title VII: (1) discrimination on the basis of sex; (2) hostile work environment; and (3) retaliatory discharge.  The County seeks summary judgment on each of these claims.  For the reasons set forth below, the Court grants in part and denies in part the County's motion regarding Plaintiff's claims of sex discrimination; denies the County's motion regarding Plaintiff's claims of hostile work environment; and grants the County's motion regarding Plaintiff's claims of retaliatory discharge.

A.  **Sex Discrimination Under Title VII**

Plaintiff bases her sex discrimination claim on: (1) her inability to work overtime; (2) disciplinary actions taken against her in January 2020; (3) discriminatory statements made by her supervisor during two training sessions in February 2020 resulting in her subsequent transfer to the Emergency Management Department; and (4) her termination. The County argues that summary judgment is appropriate on each of these claims because Plaintiff cannot make out a prima facie case of sex discrimination and, on the third and fourth claims, even if she could prove a prima facie case, the County had legitimate non-discriminatory reasons for its actions.

Because Plaintiff does not rely on direct evidence of discrimination, the Court considers her sex discrimination claims under the familiar burden-shifting analysis set forth in *McDonnell Douglas v. Green*.[18]  Under *McDonnell Douglas*, the plaintiff bears the initial burden of production to establish a prima facie case of discrimination.[19]  This burden is "not onerous."[20] To establish a prima facie case of sex discrimination under Title VII, Plaintiff must demonstrate

---

[18] 411 U.S. 792, 802–05 (1973); *see also Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

[19] 411 U.S. at 802.

[20] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

(1) membership in a protected class; (2) an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[21]

If the plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[22]  If the defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to present evidence from which a jury might conclude that the defendant's proffered reason is pretextual, that is, "unworthy of belief."[23]

For the reasons set forth below, the Court grants in part and denies in part the County's motion for summary judgment on Plaintiff's claims of sex discrimination.  The County's motion as to Plaintiff's first claim of sex discrimination based on denial of overtime is denied, but the County's motion as to the remainder of Plaintiff's claims of sex discrimination is granted.

### 1. Denial of Overtime Work

Plaintiff claims that a supervisor, Rick Schwindt, refused to allow her to work overtime because he did not like homosexuals and that this refusal constitutes sexual discrimination under Title VII.  The County concedes that Plaintiff meets the first prong of her prima facie case, but argues that the denial of overtime does not constitute an adverse employment action and that the circumstances do not give rise to an inference of discrimination.  The Court disagrees on both fronts.

---

[21] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 n.1 (10th Cir. 2015) (acknowledging that the Tenth Circuit has used different versions of the prima facie test, but stating that it has "express[ed] a preference for more concise formulations." (citations omitted)).

[22] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[23] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

It is true, as the County explains, that the uncontroverted facts point to only one specific instance where Schwindt was reprimanded for violating the County's sexual harassment policy when he denied Plaintiff the opportunity to work an overtime shift based on her sexual orientation. But just because Schwindt was only reprimanded once does not mean the conduct only occurred once. Indeed, Plaintiff alleges that she was consistently denied overtime opportunities—her name would vanish from the overtime signup sheet and, thus, other employees would be given the opportunity to work the overtime shift instead of her. While the Court agrees that a single instance of denial of overtime may not constitute an adverse employment action, persistent denial of overtime opportunities certainly does.[24] Thus, viewing the facts in the light most favorable to Plaintiff, the Court is satisfied that the second prong of her prima facie case is met.

The Court is likewise satisfied that Plaintiff has met the third prong of her prima facie case by showing that the circumstances surrounding her consistent denial of overtime give rise to an inference of discrimination. As set forth above, the County concedes that on at least one occasion, Schwindt explicitly denied Plaintiff an overtime opportunity because of her sexual orientation.[25] In addition, Plaintiff alleges that when she asked about why her name was removed from the overtime signup sheet, she was told by her supervisor, "you know how it is with the uppers,"[26] and that despite informing another supervisor about the issue, Schwindt's

---

[24] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1151 (10th Cir. 2005) (finding that conduct preventing the plaintiffs from working additional overtime constituted an adverse employment action); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (finding, in the context of a retaliation claim, that a change of assignment which resulted in plaintiff being ineligible for an extended contract—i.e., overtime work—constituted an adverse employment action).

[25] *See ,e.g., Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (explaining that a variety of circumstances can give rise to inference of discriminatory motive, including actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus and preferential treatment to employees outside protected class).

[26] Doc. 41-1 at 105:16–17.

behavior was allowed to continue.  Viewing these allegations in the light most favorable to Plaintiff, the Court finds that a reasonable jury could infer that the circumstances surrounding her denial of overtime are more likely than not the result of sex discrimination.

Having satisfied her prima facie case, the burden under *McDonnell Douglas* shifts back to the County to articulate a legitimate, nondiscriminatory reason for denying Plaintiff overtime work.  The County, however, does not even attempt to make such an articulation.  Therefore, the burden does not shift back to Plaintiff to establish that the County's proffered rationale is merely pretext.  Instead, the Court must deny the County's motion for summary judgment as to Plaintiff's claim of sex discrimination based on denial of overtime.

### 2. *January 2020 Discipline*

Plaintiff's next claim of sex discrimination is based on disparate discipline.[27]  Plaintiff claims that at the time that her supervisor, Campbell, disciplined her in January 2020 for making inappropriate remarks to a guest speaker, Campbell harbored discriminatory animus towards her, which then revealed itself in February 2020, when Campbell was disciplined for making discriminatory remarks towards Plaintiff.  The first two elements of Plaintiff's prima facie case are easily met here: Plaintiff is in a protected class due to her sexual orientation, which the County concedes, and Plaintiff suffered an adverse employment action in being disciplined for violating the County's Sexual Harassment Policy by harassing a guest speaker.

As to the third prong, the Court finds that Plaintiff has failed to establish that the circumstances surrounding her January 2020 discipline give rise to an inference of sex discrimination.  The only evidence Plaintiff points to in support of this claim is that a month after her own discipline, Campbell was reprimanded for making discriminatory remarks towards

---

[27] *Metzger v. City of Leawood*, 144 F. Supp. 2d 1225, 1253 (D. Kan. 2001) (internal citations omitted).

Plaintiff.  But these were two entirely separate events, and there is no evidence in the record that Plaintiff's January 2020 discipline had anything to do with Campbell's apparent animus towards Plaintiff.  To be sure, one of the methods by which this third prong may be met—though Plaintiff does not set forth this or any other method to meet it—is by showing that the employer treated similarly situated employees differently.[28]  In fact, the record, read in the light most favorable to Plaintiff, shows that Campbell also disciplined the other male employee that was involved in the very same situation that Plaintiff was disciplined for.

Even if Plaintiff was able to meet all three elements of her prima facie case of disparate discipline, the County would still not be liable because it articulates a legitimate, nondiscriminatory reasons for disciplining Plaintiff, and Plaintiff fails to submit evidence that the County's stated reason is pretextual.  The uncontroverted facts show that Plaintiff and her superior, Carter, were both disciplined in January 2020 for inappropriate remarks made to a guest speaker in violation of the County's Sexual Harassment Policy.  Plaintiff claims that the January 2020 discipline was a result of either Campbell twisting her words, or due to the investigation the County conducted into her allegedly inappropriate relationship with Pollet and another employee earlier in the career which had apparently upset Pollet, but Plaintiff concedes that she made the comments to the guest speaker that the County deemed inappropriate.  In other words, the County has articulated a legitimate, nondiscriminatory reason for disciplining Plaintiff in January 2020, and Plaintiff has not shown that those articulated reasons were not the real reasons or were a pretext for its actions.

---

[28] *Lewis v. Four B Corp.*, 347 F. Supp. 2d 1017, 1023 (D. Kan. 2004) (citing *Jones v. Denver Post Corp.*, 204 F.3d 748, 753 (10th Cir. 2000)).

Thus, the Court grants the County's motion for summary judgment on Plaintiff's claim of sex discrimination based on her January 2020 discipline.

### 3. February 2020 Discrimination Against Plaintiff and Her Subsequent Transfer to the Emergency Management Department

Next, Plaintiff brings a sex discrimination claim against the County for Campbell's discriminatory remarks towards Plaintiff at two training sessions in February 2020, and Plaintiff's subsequent transfer from JDC to the Emergency Management Department.[29]  The County again concedes the first element of Plaintiff's prima facie case, and admits that Campbell made the discriminatory statements towards Plaintiff and that Campbell was disciplined for making such statements.  The County argues that there is no evidence to support the second and third elements because the transfer did not constitute an adverse employment action and Plaintiff was not transferred for any discriminatory purpose.  The Court agrees.

The Court first considers whether the transfer from JDC to the Emergency Management Department constituted an adverse employment action.  Although the Tenth Circuit takes a broad view of what constitutes an adverse employment action, "mere inconvenience or an alteration of job responsibilities" does not qualify.[30]  An adverse employment action with respect to a discrimination claim "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[31]  Thus, in order for a change in benefits to constitute

---

[29] Although neither party raises the issue, the Court notes that the uncontroverted evidence of Campbell's discriminatory statements does not constitute direct evidence of discrimination such that the *McDonnell Douglas* analysis is inapplicable.  "[S]tatements expressing a personal opinion, 'even when reflecting a personal bias or prejudice, do not constitute direct evidence of discrimination.'" *Mitchell v. City of Wichita*, 140 Fed. Appx. 767, 778 (10th Cir. 2005) (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999)).  Thus, this claim must still be analyzed under the *McDonnell Douglas* framework.

[30] *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (citations omitted).

[31] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (collecting cases).

an adverse employment action, as Plaintiff asserts here, the change in benefits must be significant.[32]

Plaintiff maintains that her transfer does constitute an adverse employment action, because she was not entitled to promotions or merit pay increases while she was working in the Emergency Management Department.  However, the uncontroverted facts show that Plaintiff was on disciplinary probation during her time at the Emergency Management Department, which is the reason she would have been ineligible for a promotion, regardless of where she was staffed.  As for pay, the uncontroverted facts show that Plaintiff received the same compensation while working for the Emergency Management Department.  Plaintiff asserts that she was ineligible for merit pay raises while working for the Emergency Management Department but offers no evidence of this.  The County, on the other hand, maintains that Plaintiff would have been eligible for an annual pay raise in April 2021, which was well after Plaintiff's termination, and that Plaintiff received a $1,000 hazard pay bonus for her work in the Emergency Management Department during the COVID-19 pandemic.  There is no evidence in the record that Plaintiff's transfer from JDC to the Emergency Management Department resulted in *any* change in her benefits, let alone a significant change.  Thus, the Court is satisfied that the transfer was not an adverse employment action and, therefore, Plaintiff has failed to establish a prima facie case of sex discrimination for this claim.

Even assuming *arguendo* that Plaintiff did make out a prima facie case of sex discrimination for her transfer from JDC to the Emergency Management Department, such that the *McDonnell Douglas* burden shifted to the County, this claim would still fail.  Indeed, the County has set forth a legitimate, nondiscriminatory basis for transferring Plaintiff from JDC to

---

[32] *Moore-Stovall v. Shinseki*, 969 F. Supp. 2d 1309, 1322 (D. Kan. 2013).

the Emergency Management Department—accommodating Plaintiff's own request to not work under Campbell's supervision.  Plaintiff has made no claim that this articulated reason is pretext for discrimination and, in fact, has conceded that the transfer was *not* done out of discriminatory animus.  For all these reasons, the Court grants the County's motion for summary judgment as to this claim.

    *4.  Termination*

Plaintiff's final claim of sex discrimination against the County is based on her termination of employment.  Neither party addresses whether Plaintiff has made a prima facie case of sex discrimination based on her termination, and instead both jump directly to whether the County's articulated reason for Plaintiff's termination is pretextual.  Therefore, the Court assumes without deciding that Plaintiff can establish a prima facie case on her claim of sex discrimination based on her termination and, therefore, under *McDonnell Douglas*, the burden of production shifts to the County to articulate a facially nondiscriminatory reason for Plaintiff's termination.  The County meets this burden by stating that it terminated Plaintiff for making offensive and sexually explicit comments in front of juveniles and to co-workers, with consideration given to her long history of disciplinary actions, including a previous disciplinary action for making indecent comments in front of juveniles for which she was warned that if that behavior happened again, she could be dismissed.

Thus, the burden shifts back to Plaintiff to demonstrate that the County's stated reason for her termination is a pretext for sex discrimination.  At the summary judgment stage, the Court need only determine whether the evidence Plaintiff presented, viewed in a light most favorable to her, could allow a reasonable jury to find that the County's articulated reason for terminating

Plaintiff's employment was pretextual.[33]  Plaintiff presents three types of pretext evidence: (1) that the County's stated reason for her termination is false; (2) that the County failed to talk to her about the events leading up to her termination prior to terminating her employment; and (3) that other similarly situated employees received differential treatment for the same conduct.

First, Plaintiff argues that the County's stated reason for her termination was not the true reason.  Rather, Plaintiff seems to argue that she was terminated because the County generally was "out to get her."  In support of this argument, Plaintiff points to testimony from her former co-worker, Dewey, who stated that management wanted to terminate her.  Notably, Plaintiff does not allege that management wanted to terminate her due to her sexual orientation.  Plaintiff does make specific allegations about three members of the County's management that she claims either "had it out for her" or discriminated against her because of her sexual orientation: Pollet, Campbell, and Schwindt.  But in determining whether the County's stated reason for termination is pretextual, the Court examines "the facts as they appear to *the person making the [termination] decision*."[34]  Here, the person making the termination decision was Beavers, and Plaintiff has presented no evidence that Beavers "had it out" for her or harbored any discriminatory animus against Plaintiff.  In fact, Plaintiff admits that Beavers had never discriminated against her.  Therefore, there is no evidence that when Beavers was presented with the October 5 reports about Plaintiff she was influenced by any form of discrimination that led to the termination decision.

---

[33] *Potter v. Synderlink Corp.*, 562 F. App'x 665, 674–75 (10th Cir. 2014) (citing *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1220 (10th Cir. 2007)).

[34] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001).

Second, Plaintiff suggests that Beavers' failure to discuss the October 5 complaints with her prior to her termination is further evidence of pretext. The Tenth Circuit has recently rejected this very argument. In *Markley v. U.S. Bank N.A.*, an employee argued that the fact that his employer did not provide him with a reasonable opportunity to respond to the complaints made against him was evidence of pretext.[35] The court explained that it "never said an employer, to avoid an inference of pretext, must give an employee an opportunity to explain his version of events."[36] Rather, failing to interview an employee prior to terminating their employment would *not* permit an inference of pretext, especially where there was no indication that the person making the decision to terminate harbored any bias, "because a jury would [be] left to speculate whether such an omission was attributable . . . to discrimination."[37] The same is true here. As discussed above, there is no indication in the record that Beavers harbored any bias towards Plaintiff. Therefore, the fact that Beavers did not consult Plaintiff prior to making the termination decision does not, in and of itself, permit an inference of pretext.

Finally, Plaintiff argues that an inference of pretext is warranted because she was treated differently than other employees in her termination. Specifically, Plaintiff points to the fact that the County disciplined, but did not terminate, Campbell or Schwindt when they engaged in sexual harassment. In order to establish pretext by showing differential treatment, Plaintiff must show that: "(1) [her] nonprotected similarly-situated colleagues violated [the County's] 'rules of comparable seriousness'; (2) [the County] treated them differently (by, for example, not

---

[35] 59 F.4th 1072, 1086–87 (10th Cir. 2023).

[36] *Id.* at 1087.

[37] *Id.*

terminating their employment, as it did with [Plaintiff]); and (3) this differential treatment is not trivial, accidental, or explained by nondiscriminatory motives."[38]

As to the first prong, Plaintiff's argument fails because Campbell and Schwindt are not similarly situated colleagues and, therefore, are not appropriate comparators.[39]  To be considered similarly situated to Plaintiff, Campbell and Schwindt must have (1) dealt with the same supervisor, and (2) been subject to the same standards governing performance evaluation and discipline.[40]  While all three were certainly subject to the same standards—the County's Sexual Harassment Policy—the uncontroverted facts show that Campbell was JDC's Operations Coordinator, and Schwindt was JDC's Third Shift Supervisor, and that each of them were in a supervisory role over Plaintiff.  There is nothing in the record that indicates that Campbell or Schwindt reported to the same supervisor as Plaintiff, and their titles all indicate very different roles.  Therefore, even assuming the second and third prongs were met, because Plaintiff cannot establish that there were any non-protected similarly situated comparators, Plaintiff cannot make a prima facie case, and the Court grants the County's motion for summary judgment on Plaintiff's claim of sex discrimination based on her termination.

### B.  Hostile Work Environment Under Title VII

Under Title VII, an employer is prohibited from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[41]  The statute applies to

---

[38] *See Herrera v. United Airlines, Inc.*, 754 F. App'x. 684, 693 (10th Cir. 2018) (citing *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[39] *Id.* (citing *Aramburu v. Boeing Co.*, 122 F.3d 1398, 1404 (10th Cir. 1997)).

[40] *Id.*

[41] 42 U.S.C. § 2000e-2(a)(1).

discriminatory hostile or abusive work environments in addition to "tangible" forms of discrimination.[42]  The elements of a sexually hostile work environment are:

> (1) the plaintiff is a member of a protected group; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was based on the protected characteristic (in this case, sexual orientation); and (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.[43]

The parties agree that Plaintiff is a member of a protected class based on her sexual orientation, and that she was subject to, at the very least, some unwelcome harassment.  The parties dispute, however, whether all of the harassment Plaintiff faced was based on her sexual orientation, and whether it was sufficiently severe or pervasive to constitute a hostile work environment.  Therefore, the Court considers whether Plaintiff's evidence raises a genuine dispute as to these two elements of her prima facie case.  Ultimately, the Court concludes that it does.

### 1. *Plaintiff's Proffered Hostile Work Environment Evidence*

Plaintiff presents three categories of evidence that she contends create a genuine issue of hostile work environment based on her sexual orientation: (1) comments or conduct that was overtly based on her sexual orientation; (2) hostile comments made about other employees' sexual orientation; and (3) facially-neutral conduct demonstrating that she (and other employees who share her sexual orientation) was treated differently than her heterosexual co-workers.

---

[42] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21(1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

[43] *Asebedo v. Kan. State Univ.*, 559 F. App'x 668, 670 (10th Cir. 2014) (citing *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262–63 (10th Cir. 2005)).

As to the first category, Plaintiff alleges that her supervisor, Schwindt, told Plaintiff directly that he did not like gay people; that Schwindt announced her sexual orientation to other employees; and that other employees called Plaintiff a "dyke."

As to the second category, Plaintiff alleges that other employees called lesbians generally "dykes"; that a supervisor stated that he wanted to write up gay employees for wearing skinny jeans; and that a supervisor, Campbell, stated in the two February 2020 training sessions that gay people were sinners and were going to hell.

As to the third category, Plaintiff alleges that the following facially-neutral conduct demonstrates that she was treated differently than her heterosexual peers: that she was written up, suspended for five days, demoted from acting shift supervisor, and transferred to the Emergency Management Department in January 2020 after Campbell twisted her words; that a supervisor solicited complaints about Plaintiff from Dewey but never interviewed Plaintiff regarding the October 5 incident described in Wilken's report; that despite the County finding that Campbell had made discriminatory comments to Plaintiff, it was Plaintiff, not Campbell, who was transferred; that the County only informally disciplined Schwindt for his discriminatory behavior; that Plaintiff and three other gay employees were written up for playing foosball when other employees engaging in substantially similar activities were not written up; and that her employment was ultimately terminated.

### 2. Sexual Orientation-Based Harassment

For purposes of a hostile work environment claim, the Court must avoid viewing individual instances of hostility in isolation but instead, must look to the "totality of the circumstances."[44]  Therefore, even though this Court granted summary judgment on some of

---

[44] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 959 (10th Cir. 2012).

Plaintiff's claims of sex discrimination, the Court can nonetheless consider those same claims in determining whether they, coupled with the other evidence set forth by Plaintiff, resulted in a hostile work environment.

The County does not contest that Plaintiff's allegations of harassment in the first category above were based on her sexual orientation, but argues that they were isolated incidents that are not severe or pervasive enough to constitute a hostile work environment.  The County argues that some of Plaintiff's allegations of sexual harassment in the second category were not based on sexual orientation, and therefore do not constitute evidence of a hostile work environment based on sexual orientation.

First, the County argues that in order for the comment made by a supervisor regarding wanting to write up gay employees for wearing skinny jeans to be considered part of a hostile work environment, Plaintiff must show that she subjectively found it offensive.  The County argues that Plaintiff could not have found that comment offensive because Plaintiff admitted that this particular supervisor, Carter, never exhibited any discriminatory bias towards her, and that she could not recall hearing Carter make derogatory statements about gay people.  But evidence of harassing comments directed at other individuals will support an inference of sexual orientation based hostile work environment if Plaintiff "was present when they were made *or otherwise became aware of them* 'during the time that she was allegedly subject to a hostile work environment.'"[45]  Thus, even if Plaintiff did not directly hear Carter making derogatory comments or was herself a victim of discrimination by Carter, his actions towards others could give rise to a claim of hostile work environment.

---

[45] *Unal v. Los Alamos Pub. Sch.*, 638 F. App'x 729, 737 (10th Cir. 2016) (quoting *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995); superseded on other grounds by *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

Second, the County argues that in taking steps to address the discriminatory comments made by Campbell during the two February 2020 training sessions, it established that it did not maintain a hostile work environment.  This argument is unavailing because it goes to the County's liability and not whether the comments themselves, prior to the County's subsequent actions, are based on sexual orientation such that they can be considered in the analysis of a hostile work environment.  Neither the County's liability, nor the *Faragher/Ellerth* affirmative defense is before the Court on summary judgment.

Finally, the County asserts that the facially-neutral conduct that Plaintiff relies on to demonstrate that she was treated differently than heterosexual employees was not based on Plaintiff's sexual orientation but was, in fact, neutral.  For the most part, the County refers to and relies on its arguments that the same complained-of conduct did not constitute sex discrimination.  In assessing the totality of the evidence supporting a hostile work environment claim, "what is important . . . is the *environment*, and [facially]-neutral harassment makes up an important part of the relevant work environment."[46]  Therefore,

> when a plaintiff introduces evidence of both [facially discriminatory] and [facially]-neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct . . . as the product of [sexual orientation] hostility, then it is for the fact finder to decide whether such an inference should be drawn.[47]

As set forth above, Plaintiff presented evidence of numerous facially neutral incidents that a jury could view as products of sexual orientation hostility.

---

[46] *Hernandez*, 684 F.3d at 960 (emphasis added) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005)).

[47] *Id*. (alterations added) (quoting *Chavez*, 397 F.3d at 833).

Therefore, the Court is satisfied that Plaintiff has presented sufficient evidence at the summary judgment stage to support the third element of her prima facie case for this claim because, viewing all three categories of evidence together, in context, a reasonable jury could conclude that the harassment Plaintiff experienced was based on her sexual orientation.

### 3. Severity or Pervasiveness

Next, the Court considers whether the sexual orientation harassment was sufficiently severe or pervasive to have altered a term, condition, or privilege of Plaintiff's employment.  To survive summary judgment on her hostile work environment claim under Title VII, Plaintiff must show that a reasonable jury could find that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.[48]  The Court determines the existence of such an environment by looking at the totality of the circumstances in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[49]

A hostile work environment claim may be established by showing either pervasiveness or severity—they "are independent and equal grounds" for such a claim.[50]  "Nevertheless, those two grounds 'are to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period

---

[48] *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1140 (10th Cir. 2008) (citing *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).

[49] *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[50] *Tademy*, 614 F.3d at 1140 (quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)).

of time also violates the statute.'"[51]  The Court evaluates these factors from both a subjective and objective viewpoint,[52] considering not only the effect that the discriminatory conduct actually had on Plaintiff, but also the impact it would likely have had on a reasonable employee in Plaintiff's position.[53]

In requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[54]  In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII is not meant to be a "general civility code."[55]  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[56]  On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[57]  The determination of whether a hostile environment existed "is not, and by its nature cannot be, a mathematically precise test."[58]

Here, Plaintiff points to no single incident that was sufficiently severe to satisfy the severity element of a hostile work environment claim on its own.  Instead, Plaintiff seems to

---

[51] *Id.* (quoting *Cerros v. Steel Techs, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).

[52] *Id.* (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 29 F.3d 1408, 1413 (10th Cir. 1997)).

[53] *Harris*, 510 U.S. at 21–22.

[54] *Id.* at 21.

[55] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

[56] *Id.* (citation omitted).

[57] *Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (quoting *Harris*, 510 U.S. at 22).

[58] *Id.* at 1220 (quoting *Harris*, 510 U.S. at 22).

argue that in consideration of all the relevant conduct—all three categories described above—a reasonable jury could conclude that she was subjected to a severe and pervasive environment of hostility because of her sexual orientation.  The Court agrees.

As to pervasiveness, Plaintiff alleges that the various discriminatory incidents were happening repeatedly, and that derogatory comments about lesbians were made at least monthly. The first incident Plaintiff points to in support of her hostile work environment claim occurred in 2012.  Reading these facts in the light most favorable to Plaintiff, this means that she suffered harassment at the County for nearly ten years.  Further, as to severity, Plaintiff alleges that she had to seek psychological counseling—even before her employment was terminated—because she had become so distraught over her treatment at work.  The Court notes that "[t]he severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."[59]  In light of this, and because the Court is satisfied that a reasonable jury could conclude from Plaintiff's allegations that the County's conduct was from an objective and subjective viewpoint, sufficiently severe and pervasive, the Court denies the County's motion for summary judgment on Plaintiff's hostile work environment claim.

## C. Retaliatory Discharge Under Title VII

Plaintiff's final claim against the County is that her employment was terminated in retaliation for the complaint she made against her supervisor, Campbell, making discriminatory statements about homosexuals during two training sessions in February 2020.  The County seeks summary judgment on this claim, arguing that Plaintiff's discharge was not at all related to the complaint Plaintiff made against Campbell.  The Court agrees, and for the reasons set forth

---

[59] *Rush v. Speedway Buick Pontiac GMC, Inc.*, 525 F. Supp. 2d 1265, 1274 (D. Kan. 2007) (citing *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007)).

below, grants summary judgment in favor of the County on Plaintiff's retaliatory discharge claim.

Because Plaintiff relies only circumstantial evidence to prove her retaliation claim, the Court again follows the *McDonnell Douglas* framework.  For a retaliation claim under this framework, Plaintiff must first establish a prima facie case of retaliation by presenting evidence that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) a causal connection exists between the protected activity and the materially adverse action.[60]  In other words, she must establish that her protected activity was a "but-for" cause of the alleged adverse action by the employer.[61]  The only element of the prima facie case at issue here is the causal connection—the County does not contest that Plaintiff engaged in protected opposition to discrimination when she reported Campbell's comments, or that Plaintiff suffered a materially adverse action in having her employment terminated.

In order to establish a causal connection, Plaintiff "must present 'evidence of circumstances that justify an inference of retaliatory motive.'"[62]  "The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise."[63]  Courts may infer a causal connection "[i]f the protected conduct is closely followed by the adverse action."[64]

---

[60] *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (citing *PVNF*, 487 F.3d at 803).

[61] *Nealis v. CoxCom, LLC*, 731 F. App'x 787, 790 (10th Cir. 2018) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

[62] *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Williams v. W.D. Sports, N.M. Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)).

[63] *Id.*

[64] *Id.*

Although close temporal proximity does not require a specific amount of time, the Tenth Circuit

has explained the requirement for purposes of the prima facie case as follows:

> It appears clear that, if the adverse action occurs in a brief period
> up to one and a half months after the protected activity, temporal
> proximity alone will be sufficient to establish the requisite causal
> inference; but it is equally patent that if the adverse action occurs
> three months out and beyond from the protected activity, then the
> action's timing alone will not be sufficient to establish the
> causation element.  However, where along the temporal line
> beyond one and one-half months but short of three months, the
> adverse action's timing ceases to be sufficient, standing alone, to
> establish the requisite causal inference is less than pellucid.[65]

Here, the uncontroverted facts show that Plaintiff made a complaint against Campbell for

discrimination on March 4, 2020, and that Plaintiff was terminated seven months later in October

2020.  Because a seven-month time period does not in and of itself support an inference of

retaliatory motive, Plaintiff must present additional evidence to establish the necessary causal

connection.[66]  However, Plaintiff has failed to set forth any such additional evidence and,

instead, simply states that "[a]t this point, [Plaintiff] has established a prima facie case of

retaliation."[67]  This, without more, is insufficient for Plaintiff to establish her prima facie case of

retaliatory discharge.[68]

Even assuming *arguendo* that Plaintiff could establish a prima facie case of retaliation on

the basis of her termination, her claim would still fail.  The County has articulated a legitimate,

---

[65] *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (citations omitted).

[66] *Proctor v. UPS*, 502 F.3d 1200, 1209 (10th Cir. 2007) (citing *Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007)).

[67] Doc. 41 at 22.

[68] Plaintiff attempts to argue that although her termination was not in temporal proximity to her complaint against Campbell, it was in such proximity to her transfer back to JDC and, thus, an inference of retaliatory motive should be made.  However, that is simply not the test—the test is whether there is temporal proximity between the adverse employment action and the protected activity.  Plaintiff's transfer from the Emergency Management Department back to JDC was not a protected activity.

nondiscriminatory basis for terminating Plaintiff: her violation of the County's Sexual Harassment Policy while on disciplinary probation by making inappropriate statements in front of juveniles and other employees.  Thus, the County would have met their burden under *McDonnell Douglas*, and the burden would have shifted back to Plaintiff to establish that this articulated reason was pretextual.

In support of her pretext argument, Plaintiff relies on and incorporates by reference the arguments she made in support of her claim of sex discrimination on the basis of her termination.[69]  For the same reasons the Court rejected Plaintiff's pretext arguments with regard to her sex discrimination claim based on her termination, the Court rejects them here.  For all of these reasons, the Court grants the County's motion for summary judgment on Plaintiff's claim of retaliatory discharge.

**IT IS THEREFORE ORDERED BY THE COURT** that the County's Motion for Summary Judgment (Doc. 36) is **granted in part and denied in part**.  The County's motion is denied on Plaintiff's claim of sex discrimination based on denial of overtime work and granted on Plaintiff's remaining claims of sex discrimination.  The County's motion is denied on Plaintiff's claims of hostile work environment.  The County's motion is granted on Plaintiff's claims of retaliatory discharge.

**IT IS SO ORDERED.**

Dated: March 9, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[69] In her response to the County's motion for summary judgment, Plaintiff incorporates by reference the arguments set forth in "Section D(6)."  Doc. 41 at 22.  The Court notes, however, that Section D(6) does not appear in the brief.  The Court assumes that Plaintiff is referring to Section E(6) (Heather – Count I – Sex Discrimination, Termination).